May it please the Court, my name is Manuel Sosa and I represent Appellant San Juan Towing & Marine Services, Inc. I would like to respectfully request to set aside three minutes for review of the argument. Three minutes? Three minutes. All right. Thank you, Your Honor. May it please the Court. Is the panel interested in a summary of the facts? I can go briefly over them. Briefly. Okay, San Juan Towing is the owner of a floating dry dock that was 150 feet long and 70 feet wide. San Juan Towing purchased insurance coverage for this floating dry dock back in April 2011 and it paid a premium corresponding to property damage of $17,500. Late in the evening between September 28 and 29 of 2011, the dry dock sank while it was at its permanent location at the pier at San Juan. The dry dock sank because during the normal ballasting process, a fire hose was inadvertently left open and it created a progressive flooding that was ultimately catastrophic. The dry dock was successfully refloated on October 28, 2011 and it was declared a constructive total loss or a total loss. How much did you pay for the dry dock? The dry dock was about $1.25 or $1.35 million. The estimation I have is $1,050,000. Is that correct or maybe not? What was that? $1,050,000. What was the question again? What did your client pay for the dry dock? I think it was $1.3 million. That was what you insured it for. That was not what you paid. As I understand, correct me if I'm wrong. The insured value was $1.75 million. Okay. This dry dock that you're talking about, it actually had a name, the Perseverance? The Perseverance, that's correct. And it was listed, when I looked at the insurance policy, it was listed on the vessel schedule as the Perseverance. And then, as I also understand it, you had a declared hull value as well. That's correct. So why is not, it seems to me, ocean marine insurance applies to, under the statute, insurance upon hulls? Well, Your Honor, now that we're going into Section 1101 of the Puerto Rican Insurance Code, when the statute specifically mentions vessels, hulls, and craft, basically vessels, hulls, and craft are the same thing. If you, if the general meaning of the terms vessel, hull, and craft are the same. But regardless of that, the Perseverance, even though it has a name, it was correctly held not to be a vessel by the district court and based on the recent Supreme Court decision in the City of Riviera v. Lossman. So that particular item of Section 1101 of the Puerto Rican Insurance Code, someone towing is arguing that it is in a faucet. But it clearly had hulls. Didn't the hulls allow this to float and float out on the water and to incorporate and hold ballast? Oh yes, Your Honor, certainly the craft is a floating structure. That is undisputed. How do you explain why it's not, since ocean marine insurance under the statute is defined to include insurance upon hulls, and you had this perseverance that you had a hull value declared an insurance on the hull. Well, Your Honor, I might say that the fact that the marine insurance industry calls proper insurance over a structural hull insurance does not mean that the structure is a vessel or that it has actually a hull. Hull is a term of art that basically means proper insurance. How did this floating dry dock get to its place where it sunk? The dry dock was floated, was towed from Louisiana to San Juan, and it was placed at a basically permanent location at Pier 15 at San Juan. It was never moved from there. It was only moved by pulling ropes from a pickup truck or by line handlers. But it was basically in the same place the entire time it was at San Juan. How did it differ from a barge in respect that it was towed there? What was that? How would it differ from a barge? Well, Your Honor, a barge is a vessel. And I might... That's why I'm wondering why this isn't a vessel. Exactly. I might submit that the opinion of the city of Rivera v. Lossman conclusively established that this kind of structures, even though they are floating and that they can be moved and they can be towed around, they are not vessels. The district court actually ruled upon that, and that is actually not an issue on appeal. I think I'm wasting your time by asking these questions. No problem, Your Honor. No problem. Let me ask you something. The insurance policy itself also has an endorsement which says the Perseverance is a dock. Is that correct? The Perseverance is a floating dry dock. That's correct. That is endorsement number five. It is what we are referring to as a dry dock endorsement. And San Juan Towing's argument regarding that particular endorsement is that case law has established that when an endorsement is worded in the particular way that this endorsement was worded, that it constitutes a stand-alone separate insurance contract that is grafted within that policy. In my preparation for this argument, I run into an example that I think might be useful for the court. This situation involving the stand-alone endorsement is similar to an insurance policy with a standard mortgagee clause, which is designed to protect the interest of a mortgagee, that regardless of a mortgage or an insured violating or breaching the terms of the policy, the rights of the beneficiary, the mortgagee, are not affected by that because the insurance company has a separate agreement of insurance with that mortgagee. I have the authority to provide the court if they are interested. Could you go back to the endorsement that Judge Thompson asked you about? That endorsement, when I look at the perils, when you get an insurance policy, you want to be insured against certain types of perils, and that tells us something about the insurance you're getting. If it's professional liability, then you're looking for professional liability policy. This endorsement insures your client's perseverance against perils defined as the perils of the seas, rivers, lakes, harbors, men of war, fire, enemies, pirates, rovers. Why isn't that ocean marine insurance? It sounds like ocean marine insurance. Your Honor, I understand the concerns of this panel, and let me say this. Certainly there is a marine salty flavor to this case, and San Juan Towing's position is that even if this policy is regarded or deemed to be a marine insurance policy, San Juan Towing's argument is still controlling in the sense that it is premised on the Puerto Rico Federal Relations Act. Section 8 of that act basically is a statement of Congress, giving the Puerto Rican legislature power to legislate over marine matters, even contrary to federal maritime law, which is federal maritime non-statutory law. But if Puerto Rico didn't decide because it wanted its shipping industry not to be prejudiced in the international insurance markets, didn't it carve out expressly in 1101 ocean marine insurance from the rules that would otherwise apply to all other types of insurance under Puerto Rico law? Yes. Well, you know, Section 1101 includes an exclusive list of what is ocean marine insurance, and in that list there is no mention whatsoever of insurance over floating dry docks. But insurance over hulls, and we've already agreed that this had a hull, and you've got insurance for perils to damage to the hulls on the seas, rivers, lakes, and harbors. So why isn't that expressly under the statute? Actually, Your Honor, San Juan Towing's position is that the word hull means vessel, and particularly when it is used right after that word, vessels, hulls, and craft, that means the same thing, vessels. Well, if it's right after hulls and vessels, it seems to me it's talking about two different things. Well, Your Honor, San Juan Towing's argument is based on the general meaning of the word. I understand the concern regarding the doctrine of eusden generis, but the general sense of the word hull is basically a vessel. So as I was saying, responding to Judge Callada's concern, certainly the case has a salty maritime flavor, and it is precisely because of that that Section 8 of the Puerto Rico Federal Relations Act is triggered, which is the provision that grants the Puerto Rico legislature power to enact legislation contrary to federal maritime non-statutory law. Now, the importance of that issue, that element, that is, what's in the law is that this Honorable Court, since 1956, has recognized the state of the law in the sense that Puerto Rico is kind of different in the tapestry of marine insurance in the national sense. Of course, the general state of the law has been premised by the decision of Southern Pacific v. Jensen, and that decision elevated maritime law to the same place as federal statutory law. And under the Supremacy Clause, of course, that should be preeminent over any inconsistent state law. That is the general state of the law. Someone told me his position is that there is an exception, and that exception has been recognized by the Garrido decision of this Honorable Court since 1956. Let me interrupt you, because I don't think anybody, I don't understand anybody in the court below or the other side to be disputing the fact that Puerto Rico could have said that the same laws that apply to all other insurance will apply to ocean marine insurance. But instead, Puerto Rico, the Commonwealth, said exactly the opposite. They wrote in 1101 and said, so why isn't that to feed your whole argument? I see my time is up. You can answer the question. Thank you very much. The general position of the Puerto Rico Insurance Code is to exclude marine insurance policy in certain places of the code. There are multiple provisions stating where marine insurance policies are not included in the regulation, in the power of regulation of the code, meaning that where it is not explicitly excluded, then it is included and it is regulated by the Puerto Rico Insurance Code. Thank you. Thank you. Mr. Carver, good morning. Good morning, Your Honor. May it please the Court, good morning. My name is James Carvin from the firm of Duane Morris, Counsel for Appellee, Catalan Syndicate 2003, Lourdes, London. The appellant's entire argument is predicated upon a position completely contrary to the way they applied for and sought this insurance. There is no dispute and the factual record is clear that San Juan went to New York and hired Franklin & Company, a marine insurance broker based in New York, and that that broker, Mr. Toscani in particular, recognized that San Juan wanted coverage for a ship repair and marine salvage operation and determined to access the marine insurance market to get a package policy to cover those risks. Mr. Toscani expressly testified that he knew it was a marine account, he was a marine insurance broker, he took that risk, and he brought it to a marine insurance market and a marine insurance underwriter in the form of account at Lourdes. He expressly testified that the dry dock perseverance, he considered a marine hull risk and included in the package marine policy he applied for. The position that San Juan has argued in this case throughout is directly contrary to their own conduct and their agent, Franco's, conduct in securing, seeking, and procuring the insurance. There are four points I'd like to cover with the court, but before I do that, Your Honor had a couple of questions and I think I can clarify them for the court before I move on. First, the purchase price of the perseverance when San Juan first acquired it was $1,050,000. They invested $1,000 to $200,000 supposedly in repairs, bringing up their out-of-pocket, if you will, to roughly 1.3. Initially, they insured it for 1.5 and then escalated the insurance to 1.75 million before they first went to Catlin seeking the insurance from Catlin. At the time they asked for the insurance from Catlin, they sold $1.75 million insurance, represented that was the value, and that's what Catlin agreed to. Your Honor also asked a question about what is the difference between this dry dock and a barge. It's a very good question, and the marine architectural experts that testified in this case commented upon that similarity as opposed to a difference. Basically, they said this dry dock is nothing more than a barge with wing walls. It's a flat, dumb barge. You have the dimensions. There are under deck, supposedly watertight compartments, and on the sides of the barge are two wings. The barge also has pumps on it because the purpose of a floating dry dock is to be submerged, allow a vessel to float into the dry dock, and then pump the water out of the under deck compartments and raise it. Very similar to a barge. If you took the wing walls off, it would look exactly like a barge that, knowing disputes, is marine hull insurance and subject to marine insurance and the exemption of 1101 in the Puerto Rican Code. The four points I'd like to cover with the Court are, number one, this was a single package policy. That's how it was applied for. That's how it was issued. There is no portion that is severable. Second, the trial fact found it to be a marine policy. There is no showing that that finding is clearly erroneous, and indeed it is a marine policy. Third, even if the dry dock hull endorsement was separable from the policy at large, which we don't believe it can be, even that dry dock hull form itself is marine insurance. And third, we believe that the doctrine of utmost good faith is established federal law and that it governs this marine insurance policy. You realize that this is the only stricter that hasn't – this is the fifth stricter, I believe. I've not really applied that – I forget what it's called now. Marine law for DA. Yeah. I recognize that this Court has not come to that conclusion, Your Honor. Several different district courts in this district within this circuit have reached that conclusion and have presupposed that the Court would so adopt utmost good faith when the question arose. We believe this is an opportunity for the Court to make that announcement. I would suggest that the only outlier – and the district courts did a wonderful job in terms of reviewing the history of utmost good faith and why it is a trenched federal admiralty law for over 250 years. And the district court did a good job of pointing out, as the Ninth Circuit has, that the only outlier, if you will, is the Fifth Circuit in the Anthea decision. And even the Fifth Circuit, in its own decision, questioned the reliability or how far they were going to press not adopting utmost good faith. And there have been several decisions in the Fifth Circuit since then that have raised the same question. I think it's only a matter of time before they come around. I would also add, Your Honor, that in preparing for the argument today and following the closure briefing, the Eighth Circuit has adopted utmost good faith as federal entrenched admiralty law applicable to our marine policy. And I can provide that site to Your Honor. Write us a letter. I will. Is it in your brief? I will. And copy to the other side. I'm sorry. No, it's not in our brief because it was decided after the briefing. Write us a letter notifying the other side. You have ten days. Absolutely, Your Honor. Thank you. In thinking through this utmost good faith, does the insurance company have any kind of obligation from the start to do any type of due diligence before it issues a policy of the appellant's assertion is that there was no application, there was no retrieval of information about this, however we choose to define it? Your Honor, the lure has been that, and correctly, I think, that the underwriter doesn't have an obligation to question the information he is presented with. The doctrine of utmost good faith goes back centuries. It recognizes many commercial practicalities. One of which is that the underwriter is sitting, for example, in this case in New York, the dry dock and the risk is in Puerto Rico. He doesn't have immediate access to that dry dock. He is entitled to rely upon the information he is given, such as the condition of the dry dock, such as the value of the dry dock, and he's entitled to rely upon that information being truthful and accurate in his assessment of the risk, pricing of the risk, and agreement to bind or not bind the risk. There are additional commercial practicalities that go into that. Once you start telling the underwriter that he has to hire surveyors for each and every vessel that he insures, it becomes an enormous expense, and that is going to have an impact upon the premium. When I have seen those things done, that cost is generally booked into the premium and passed almost dollar to dollar back to the insurers, and the insurers don't want that. Why? Because they know their own equipment. I know my car better than Notwithstanding engineers. I'm sorry? I said notwithstanding engineer studies and surveys. In this day and age, everybody is carrying a phone and can take a picture of the subject, the property, to at least do some kind of preliminary scrutiny. A picture isn't going to tell you a lot about a vessel, Your Honor. For example, in this case, the barge was painted. Well, it didn't look in bad shape. It was sitting there floating. But the picture wouldn't tell you what was on the deck. And at the trial, we introduced, as the district court said, over 200 photographs of the underdeck, which were completely wasted away, watertight bulkheads. They should have been 20, 40 feet wide, 8 feet high, completely corroded, gone. A photograph of the dry dock wouldn't tell you that. You'd have to have somebody do an inspection. And what's the point of doing an inspection when the insured himself knows the condition better than anybody, even better than a surveyor? Well, why can't you require? I mean, why is there a requirement put on the insurer? Insurer, I mean, that he present a survey of the vessel at the time he's filing the request for insurance. Well, that's a question that, Your Honor, I think every underwriter in the industry would probably have a different answer to. But the document of utmost good faith recognizes that you basically do that. When you as an insurer come to an underwriter and say, I want insurance on my vessel, and you keep mum about the fact that you have all this corrosion on the deck and an accident waiting to happen, the encumbrance is on the insured to communicate the condition. Whether he does that by survey, what's he going to need a survey for? He already knows what the condition is, or he should know what his condition is. He's a vessel operator. Counsel, let me ask you, if this were a dry dock, a fixed dry dock, what do you call it? A graving dock. A graved dry dock, would a graved dry dock not have triggered the same kind of insurance? Oh, yeah, a graving dry dock, Your Honor, is nothing more than basically a hole dug into the ground. A fixed, right. With a lock, and you can... But what kind of insurance would that have triggered? Commercial property insurance. Like on any landed structure. So it is only because this is floating that the insurance company entertained this kind of insurance? Absolutely. It was written on, the dry dock form is a form promulgated by the American Institute of Marine Underwriters, which is a 100 plus year old association, trade association of marine underwriters, and they promulgate various marine insurance forms, as well as do other things like a trade association. But this was written on a dry dock hull form, and as Judge Kenyatta pointed out, the risks under that form are classic marine risks. They touch the prowess of the seas, the adventures of the rivers. They cover against barratry, mutiny, piracy, collisions, towing risks. What's interesting, Your Honor, is the claim we have here. This is a claim for sinking. How much more room can you get? In fact, the real claim is not the sinking, because dry docks, floating dry docks, are supposed to submerge. The surprise here came when it wouldn't come up. And it wouldn't come up because it was so wasted that they were pumping and pumping and pumping, and the thing never achieved buoyancy because it was so wasted below. The real claim is that it sank and wouldn't come up, as it was designed to do. It's designed to submerge and come up. It didn't do it because it was a piece of junk. And that information was never communicated to the underwriter. Even, Your Honor, if we accept for the purposes of discussion, and I don't accept it, but even if we accept for the purposes of discussion that the insured is supposed to provide a survey of the condition, in this instance, the Schreyer effect found that the insured knew of these conditions easily a year before when he attended another surveyor going through the underdeck hall relative to an earlier claim under the earlier policy. So the insured clearly expressly knew about these conditions and never communicated it. If he's not going to tell the underwriter when he knows, the insured is not going to get a survey to give to the underwriter to tell the underwriter that. So while we can have a debate about whether a survey should be commissioned and presented. We've already gotten off on a side issue. That's not really before us right now. Okay. What I had planned on doing, Your Honor, was looking at the policy and going through the policy and highlighting for the court that it is a classic marine policy. And I'll do that briefly. And if you want to, I invite you to look at the policy with me if it's convenient. The policy begins on page 117 in the appendix. It covers the business of the insured vessel repair marine salvage. The coverage is protection and identity inclusion. It's always a liability. Counsel? I think Judge Payette. I think we can read the policy pretty well. So instead of reading it to us, is there any evidence in the record on the effect, if we were to declare that floating dry docks are not subject to admiralty law, they're not ocean marine insurance, and what impact, is there any evidence of the impact that would have on the ability to insure dry docks in Puerto Rico? Oh, yeah. When are they going to get it insured? If they can't go to the marine market, a property on the right is not going to pick up a floating risk. That's one of the reasons they have the carve out in the Puerto Rican Code. It's one of the reasons the broker went to London to get insurance because it was a floating risk, and he couldn't get the cover in Puerto Rico. With respect to the description of the coverage in the policy that I was reading, I would highlight, and I believe Your Honor made this observation, that this squares entirely with the exemption in the Puerto Rican Code section 1101. So the description of the coverage, and, in fact, the coverage provided in the policy is exactly what 1101 exempts. Another point I want to highlight in the policy is, again, as Your Honor recognized, the perseverance dry dock is listed in the vessel schedule. The dry dock form is a hull insurance form that protects the hull, but the dry dock is also covered under the policy for protection and indemnity. When we look at the vessel schedule, the dry dock perseverance is scheduled for hull coverage. That's the dry dock form, and it's also scheduled for protection and indemnity coverage, which is marine liability coverage for the owner-operator of a vessel. P&I coverage, as in hull coverage, again, is squarely exempted in section 1101 from the Puerto Rican Code. The P&I coverage is provided in the policy on page 128, and it's the same coverage that is provided for the tug. So the P&I liability coverage afforded to the dry dock is identical to the coverage afforded to the tugboat, and there's no dispute that a tugboat is a hollowware vessel. I see my time is up. I will defer to my papers. Thank you, Your Honors. Thank you. Mr. Sosa, I think you have three minutes. Thank you, Your Honor. Let me address some concerns that the Court has expressed. As for Judge Calleta's concern, the consequence of agreeing with someone's argument regarding the insurance of dry docks at Puerto Rico would be that insurance companies would have to print insurance applications like they do in every other kind of insurance, and they would have to ask potential insurers the information the company deems material to assessing the risk, as in any other kind of insurance. Where would you get an insurance? Could you go to the maritime insurance market? Of course. Of course. The Puerto Rican insurance code does not forbid a Puerto Rican client to look into a foreign market or a market dealing with oil and gas or marine insurance. That is not forbidden by the code. The question I asked Mr. Carvin was whether there was any evidence in the record that would show that, for example, maritime insurance is available in a jurisdiction that did not have the carve-out of 1101 that Puerto Rico has had. In other words, could you have even got maritime insurance? Of course. And where is the evidence in the record that you could have got maritime insurance had it been determined that this was not ocean marine insurance under Puerto Rico law? Your pleasure vessels are insured by Puerto Rican domestic insurers all the time. This is a particular structure, which is a specialized structure, and basically that's the reason that San Juan had to look into the foreign market for that particular coverage. But it would not create a chaos in Puerto Rico just to ask insurance companies to issue insurance forms and ask potential clients what they think is important for them to assess the risk. So why did your legislature then have the 1101 carve-out for ocean marine insurance? Well, there is a general public policy that if too many obstacles, let's say as, for example, requesting a survey, which is clearly important, that the legislature seems to think that it may be considered an obstacle and the potential client would not be able to seek or obtain a particular coverage because it wasn't able to obtain a survey. But really that's not the case here. We're dealing here with specialized structures and people who know about these structures and they look around the domestic insurance market, no coverage was found. They look into the international or foreign market, coverage was found. Judge Torway has had a concern about the difference between a barge and a floating dry dock. The difference would be this, a barge is designed, can I wrap it up, a barge is designed to transport passengers and goods. A floating dry dock is not. And that is the basis of the city of Riviera versus Lost Mountain. That's very good. Well, there are barges that don't carry either, they carry machinery. Like, for example, barges with a crane. Yeah, and that is a good, and that is a good, a crane. It is not transported for hire, but it is certainly good that it's transported on the structure. But a floating dry dock is not designed to do that. I think we're getting off the side of the issue anyway, but thank you. Thank you to the court for their attention. Thank you.